**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**HARRISONBURG DIVISION**

|  |  |  |
|---|---|---|
| **BROTHERHOOD OF RAILROAD** | ) | |
| **SIGNALMEN,** | ) | |
| Plaintiff | ) | Civil No. 5:20-CV-00016 |
|  | ) | |
| **v.** | ) | |
|  | ) | |
| **CSX TRANSPORTATION, INC.,** | ) | |
| Defendant | ) | **By:  Michael F. Urbanski** |
|  | ) | **Chief United States District Judge** |

## MEMORANDUM OPINION

This matter is before the court on plaintiff Brotherhood of Railroad Signalmen's ("BRS") and defendant CSX Transportation, Inc.'s ("CSX") cross motions for summary judgment. ECF Nos. 9, 20. The labor dispute focuses on CSX's decision to abolish all positions at the Savannah Signal Shop related to refurbishing signal equipment that could not be fixed onsite, and to instead purchase new or refurbished equipment from third parties. BRS argues it is entitled to summary judgment because CSX's decision abrogates the plain terms of the collective bargaining agreements, giving rise to a "major dispute" under the terms of the Railway Labor Act ("RLA"). CSX argues in the first instance that the court does not have jurisdiction to resolve the labor dispute because it constitutes a "minor dispute" under the RLA, subject to mandatory and binding arbitration. In the alternative, CSX argues that even if the court finds it does have jurisdiction, that it did not violate the terms of its agreements with BRS because the express and implied terms permit CSX to purchase refurbished equipment from third parties. The issues have been fully briefed, the court heard argument on July 28, 2020, and the matters are ripe for resolution.

# I.    FACTUAL SUMMARY

This dispute arises out of an alleged violation of a collective bargaining agreement entered between the Brotherhood of Railroad Signalmen ("BRS") and CSX Transportation, Inc. ("CSX"). BRS is the designated collective bargaining representative for railroad employees working in the signalman class under Section 1, Sixth of the Railway Labor Act ("RLA"). Complaint, ECF No. 1, at 1; 45 U.S.C. §151, Sixth. CSX is a rail carrier as defined by Section 1, First of the RLA, which comprises various regional carriers and operates throughout the eastern half of the United States. Id.; 45 U.S.C. §151, First. CSX employs BRS signalmen to perform installation, maintenance, and repair of railroad signal systems and highway-rail crossing warning systems on CSX railways as well as to refurbish and reclaim CSX's signal equipment. ECF No. 1, at 2. A series of collective bargaining agreements governed this employment relationship, establishing rates of pay, rules, and working conditions for signalmen employees. Id. The signalmen had maintained separate collective bargaining agreements with each of the formerly independent regional carriers as well as a consolidated collective bargaining agreement with CSX, the parent company. Id.

The parties agree that at issue in this case are the terms of one of these regional collective bargaining contracts, the Seaboard Coast Line Railroad Agreement ("SCL Agreement"), which governs the pay, rules, and working conditions for Signalmen working in the Savannah Signal Shop. Id at 3; Resp. to Pl. Mot. for Sum. J. and Cross Mot. for Sum. J., ECF No. 21, at 2. The relevant sections are reproduced below:

<u>SCOPE</u>

**Section 1—former Seaboard Coast Line Railroad, Clinchfield, and Richmond Fredericksburg and Potomac Railroad**

(a) This Agreement governs the rates of pay, hours of service and working conditions of all employees engaged in the construction, installation, reclaiming, renewal, repair, inspecting, testing and maintenance, either in the shop or in the field, of all interlocking systems and devices; signals and signaling systems; wayside devices and equipment for train stop and train control systems; car retarders and car retarder systems; highway grade crossing warning devices and systems; defect detector systems including hot box, acoustic, wheel impact, skewed wheel, broken flange, broken wheel, dragging equipment, slide, high and wide load, and flood; electrical, hydraulic, air, and spring switch mechanisms when protected by signals or indicators; electrically lighted switch lamps; train order signals; blower, gas, electric or other types of automatic snow removing systems installed on power-operated switches; power or signal lighting; batteries and associated charging and switching equipment; solar panels, sub-station, current generating and compressed air plants, their pipe lines and connections; all relays, printed circuit board and modules of electronic devices, used in systems covered by this agreement; bonding of track; painting; carpenter, concrete and form work in connection with the systems and devices covered by this agreement (except that required in building, towers and signal bridges); together with all appurtenances pertaining to the above-named systems and devices, as well as any other work recognized as signal work.

(b) No employee of other than those classified herein will be required or permitted to perform any of the work covered by the scope of this agreement.

(c) All kind of welding and cutting on or in connection with the installation or maintenance of signal equipment or apparatus will be the work of the employees covered by this agreement.

(d) When signal circuits are superimposed or handled on systems not covered by this agreement, the employees covered by this agreement shall install and maintain the signal circuits leading to and from common terminals where signal circuits are superimposed on other circuits…

The parties also agree that the signalmen at issue in this case are governed by the Implementing Agreement signed by all the formerly independent railroads when they merged into CSX on April 14, 1987, which was subsequently incorporated into the SCL agreement.

Id. The terms of the Implementing Agreement have been amended over time by the parties through memoranda of understanding, addendums, among other things, to reflect changes in shifts, seniority, and staffing issues. Id. ECF No. 10, at 14. The relevant sections are reproduced below:

> *all Signal Shop work currently being performed* for the C&O at Barboursville, West Virginia; for the B&O at Cumberland, Maryland; and for the C&O Pere Marquette District (PM) at Saginaw, Michigan; as well as similar work presently being performed for the former Western Maryland Railway Company (B&O-WM) at Hagerstown, Maryland; and for B&OCT at Chicago, Illinois, and to coordinate such work with previously coordinated SCL/L&N Signal Shop functions presently being performed for SCL, L&N, A&WP and CRR at Savannah, Georgia where such *will thereafter be performed on a coordinated CSXT basis under the terms and conditions of the schedule agreement between former SCL and BRS*, and…

> coordinated with work presently being performed in the coordinated SCL/L&N/ A&WP/CRR Signal Shop facility at Savannah, Georgia (which was previously coordinated pursuant to provisions of Memorandum Agreement of March 13, 1986) where *all such work will thereafter be performed on a coordinated CSXT basis by Carrier employees represented by BRS under the scope of the Schedule Agreement between former SCL and BRS* as amended in Appendix "A", attached hereto. *It is further understood that the work referred to herein will not be sent off the Carriers' properties.*

> (emphasis added).

ECF No. 1, at 3-4. The Savannah Signal Shop performed all refurbishment and reclaiming of signal equipment for the entire CSX system until February 14, 2020, when all positions within the Shop Refurbishment Section were abolished. ECF No. 1, at 5. This change was communicated by CSX Labor Relations to Gus Demott, BRS Southeast General Committee Chairman in an email sent February 7, 2020. Id.; see also Demott Decl. Ex. 4, ECF No. 10-1, at 32. The change resulted in the termination of sixteen contractor positions, one clerical position, and one position that was scheduled to be abolished upon the retirement of the employee. Demott Decl. Ex. 6, ECF No. 10-1, at 53. On February 13, 2020 BRS President

Jerry Boles sent a letter by email and overnight delivery to CSX Labor Relations that if CSX had refurbishing/reclaiming work done by contractors or otherwise sent off CSX property, then BRS will consider that to be an abrogation of the Implementing Agreement. ECF No. 1, at 5; see also Demott Decl. Ex. 7, ECF No. 10-1, at 55. CSX has not responded. ECF No. 10, at 7. At the time the positions were abolished, the Savannah Signal Shop was in possession of CSX equipment ready to be refurbished. Id.

BRS states that because CSX has equipment ready for refurbishment on its properties, including at the Savannah Signal Shop, and because CSX no longer employs signalmen, it must rely on persons other than BRS signalmen to do work off of the Carrier's property, in violation of the agreement. Id. CSX argues that it has historically either (1) repaired signal equipment on site, (2) sent equipment to be refurbished/reclaimed to the Savannah Signal Shop, or (3) purchased replacement equipment, either new or refurbished, by outside companies. ECF No. 21, at 5. It claims that its decision to shut down the Shop Refurbishment Section of the Savannah Signal Shop does not mean it will be employing contractors to refurbish its equipment, but that it would be expanding its existing practice of purchasing third party refurbished equipment as replacements for parts it cannot fix on site. Id. at 5-6. In short, CSX claims it will continue with options (1) and (3) in dealing with equipment in need of repair, but not option (2), which involved the Savannah Signal Shop.

James Purl, Assistant Chief Engineer of Signal Construction at CSX, stated in his declaration that the company began considering whether it would be "more efficient and cost effective to cease refurbishing signal equipment at the Savannah Signal Shop that could not be repaired in the field" and to instead "purchase replacement equipment." Purl Decl., ECF

No. 21-2, at 3. Michael Skipper, Senior Director of Labor Operations at CSX, stated in his declaration that he had notified Demott as early as August 2019 that the company was "considering purchasing refurbished equipment, including relays and switch machines, from an outside vendor instead of continuing to refurbish signal equipment on its property." Skipper Decl., ECF No. 21-1, at 3. Skipper claimed he told Demott that arbitral authority supported the company's decision to pursue this course of action. Id.

In accordance with this business decision, CSX entered into an agreement with RDG, LLC, a company from which it has bought new and refurbished equipment in the past, to purchase refurbished equipment on February 28, 2020. Id. at 6. CSX also entered into a separate agreement to sell decommissioned, unrepairable, or defective equipment to a company called RCL Burco, LLC. Id. CSX scraps equipment it cannot repair on site or sell to RCL Burco. Id. CSX maintains that no equipment previously refurbished by the Savannah Signal Shop is now being refurbished off site and returned directly to CSX. Id. Additionally, CSX claims it does not exercise control over any equipment once sold to RCL Burco. Id.; see also Knopsider Decl., ECF No. 21-3, at 2.

BRS disputes that the company to which CSX is selling its damaged equipment is wholly separate from the company from which CSX is purchasing refurbished equipment. ECF No. 29, at 7, fn. 1. BRS has produced a shipping order indicating that CSX shipped signal equipment to RLC Burco at the same Rochester, NY address from which it receives RDG, LLC refurbished equipment. BRS contends the new set up may be a "sham" transaction, which CSX concedes would violate the terms of the agreement, because the refurbished equipment being purchased from RDG, LLC may be the same equipment being sold by CSX to RLC

Burco to be refurbished – the same equipment previously refurbished by Savannah Signal Shop.

## II.      LAW OF SUMMARY JUDGMENT

Pursuant to Rule 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Glynn v. EDO Corp., 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with … [any] affidavits" filed by the parties. Celotex, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. (citation omitted).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the non-moving party. Glynn, 710 F.3d at 213 (citing Bonds v. Leavitt, 629 F.3d 369, 380 (4th Cir. 2011)). Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'"

McAirlaids, Inc. v. Kimberly–Clark Corp., 756 F.3d 307, 310 (4th Cir. 2014) (internal alteration omitted) (citing Tolan v. Cotton, 134 S. Ct. 1861, 1863 (2014) (per curiam)).

Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Anderson, 477 U.S. at 255. The non-moving party must, however, "set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" Glynn, 710 F.3d at 213 (quoting Anderson, 477 U.S. at 252). The nonmoving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Res. Bankshares Corp. v. St. Paul Mercury Ins. Co., 407 F.3d 631, 635 (4th Cir. 2005) (quoting Anderson, 477 U.S. at 249). "In other words, to grant summary judgment the [c]ourt must determine that no reasonable jury could find for the nonmoving party on the evidence before it." Moss v. Parks Corp., 985 F.2d 736, 738 (4th Cir. 1993) (quoting Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 124 (4th Cir. 1990)). Even when facts are not in dispute, the court cannot grant summary judgment unless there is "no genuine issue as to the inferences to be drawn from" those facts. World-Wide Rights Ltd. P'ship v. Combe Inc., 955 F.2d 242, 244 (4th Cir. 1992).

### III.    CROSS-MOTIONS FOR SUMMARY JUDGMENT

In its motion for summary judgment, CSX claims the court lacks subject matter jurisdiction to address the substantive claims because they constitute a "minor dispute" subject to mandatory and binding arbitration. This issue must be addressed first, as a threshold matter.

If the court finds it has jurisdiction over the dispute, it must then address BRS's motion for summary judgment on the merits. BRS seeks declaratory relief stating that CSX's decision to terminate the team of employees that previously refurbished CSX's signal equipment

violates the collective bargaining agreements and therefore violates the RLA. BRS claims that (1) CSX requires refurbishing work, has abolished all positions providing refurbishing services at its facilities, and therefore must necessarily be contracting with third parties for refurbishing services in violation of the collective bargaining agreement, and (2) that, indeed, CSX has already entered into contracts to purchase refurbished equipment from a third party and to sell its damaged equipment to a third party for refurbishing.

This case focuses on two inquiries: (1) a factual dispute regarding whether some of the refurbished signal equipment CSX is purchasing from RDG, LLC is the same equipment it previously sent damaged to RLC Burco and (2) a legal dispute regarding whether CSX is entitled to purchase signal equipment refurbished by non-BRS personnel. The court finds that the claims brought by BRS constitute a "minor dispute" because their resolution requires interpretation of the scope of the collective bargaining agreements and because, when in doubt, the court is obligated to construe the dispute as minor. The existence of a factual dispute does not bear on the court's jurisdictional analysis, because whether it interprets the factual dispute in the light most favorable to CSX or BRS, dispute resolution will begin and end with the terms of the existing collective bargaining agreements.

### A.    "MAJOR" vs. "MINOR" DISPUTES

CSX contends that the case must be dismissed for lack of subject matter jurisdiction. The court only has subject matter jurisdiction over this case if it involves a "major dispute" under the RLA, not a "minor dispute." United Transp. Union v. S.C. Pub. Ry. Comm'n, 130 F.3d 627, 631 (4th Cir. 1997); see Consolidated Rail Corp. v. Railway Labor Executives' Ass'n, 491 U.S. 299, 303–04, (1989) (stating that the National Railroad Adjustment Board has

exclusive jurisdiction to review minor disputes) (citing 45 U.S.C. § 153 First). "[M]ajor disputes" seek to create contractual rights, while "minor disputes" seek to enforce those rights. See id. at 302.

The statutory basis of the "major dispute" category is found in § 2 Seventh and § 6 of the RLA, 45 U.S.C. § 152, Seventh and § 156. The former states that "No carrier, its officers or agents shall change the rates of pay, rules, or working conditions of its employees, as a class as embodied in agreements except in the manner prescribed in such agreements" or through the mediation procedures established in RLA § 6. See Consolidated Rail, 491 U.S. at 302. In Consolidated Rail, the Supreme Court explained major disputes:

> [A major dispute] relates to disputes over the formation of collective agreements or efforts to secure them. They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy. They look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past.

Id. at 302 (quoting Elgin, Joliet & E. Ry. Co. v. Burley, 325 U.S. 711, 723 (1945)). See also Hawaiian Airlines, Inc. v. Norris, 512 U.S. 246, 252 (1994)  (quotations omitted). When a "major dispute" arises, the RLA requires the parties to undergo a lengthy process of bargaining and mediation. 45 U.S.C. §§ 155 and 156. Until they have exhausted those procedures, the parties are obligated to maintain the status quo, and the district courts have subject-matter jurisdiction to enjoin a violation of the status quo pending the outcome of the procedures. See Consolidated Rail, 491 U.S. at 302–03.

Minor disputes are based on RLA § 2 Sixth and § 3 First (i), 45 U.S.C. §§ 152 Sixth and 153 First (i). These sections establish conference and compulsory arbitration procedures for

disputes "arising out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions." Id. § 152 Sixth. See Consolidated Rail, 491 U.S. at 303. See also Norris, 512 U.S. at 254–55 (holding that "grievances" is merely a synonym for disputes involving the interpretation or application of collective bargaining agreements). In other words, "minor disputes" seek to "enforce [contractual rights]." Consolidated Rail, 491 U.S. at 302. When a "minor dispute" arises, it is subject to compulsory and binding arbitration, and the jurisdiction of the National Railroad Adjustment Board is exclusive. See 45 U.S.C. § 153. See also Consolidated Rail, 491 U.S. at 303–04. Therefore, district courts have no subject matter jurisdiction over "minor disputes." Id.

"The Supreme Court has stressed that the relative importance of a case does not determine whether it qualifies as a major or 'minor dispute.'" Bhd. of Maint. of Way Employes Div. v. Burlington N. Santa Fe Ry. Co., 596 F.3d 1217, 1222–23 (10th Cir. 2010). "The court must merely determine if the dispute is capable of resolution by reference to the agreement, without regard to the substantive merits; interpretation is the arbitrator's role." Ry. Labor Executives' Ass'n v. Chesapeake W. Ry., 738 F. Supp. 1544, 1550 (E.D. Va.), aff'd in part, appeal dismissed in part sub nom. Ry. Labor Executives Ass'n v. Chesapeake W. Ry., 915 F.2d 116 (4th Cir. 1990). If the right in question can be "conclusively resolved" by interpreting the collective bargaining agreement, then the dispute is minor. Norris, 512 U.S. at 265. The Supreme Court has held that collective bargaining agreements include implied terms established by the parties because these agreements are intended to serve as "generalized code[s] to govern a myriad of cases which the draftsmen cannot wholly anticipate," which renders "practice, usage and custom" relevant in determining the rights of the parties. Airline

11

Professionals Ass'n of Int'l Bhd. of Teamsters, Local Union No. 1224, AFL-CIO v. ABX Air, Inc., 274 F.3d 1023, 1028 (6th Cir. 2001) (quoting Consolidated Rail, 491 U.S. at 311-12).

The RLA was intended to encourage the use of arbitration to resolve labor disputes between unions and employers. Consolidated Rail, 491 U.S. at 305. Therefore, parties bear a "relatively light burden" in establishing a dispute as minor and depriving a district court of subject matter jurisdiction. Id. at 307. It need only show that the contested action is "arguably justified" by the terms of the collective bargaining agreement. Id. at 304-05. "[W]hen in doubt" regarding the characterization of the dispute under the RLA, courts must "construe disputes as minor." Dement v. Richmond, F. & P. R. Co., 845 F.2d 451, 463 (4th Cir. 1988) ("if a reasonable doubt exists as to whether the dispute is major or minor, we will deem it to be minor.") (citation omitted); Bhd. of Locomotive Eng'rs v. Atchison, Topeka & S.F. Ry. Co., 768 F.2d 914, 920 (7th Cir. 1985).

## B.   CREATING RIGHTS vs. ENFORCING RIGHTS

The court finds that the dispute is minor because the parties do not seek to generate new rights, but rather enforce existing rights under the contracts. Although BRS contends that CSX attempts to shoehorn an entirely new right into the contract through its interpretation, the court finds CSX's interpretation "arguably justified" under the terms of the agreements.

First, the plain language of the SLC Agreement and the Implementing Agreement address the question of refurbishing work. Therefore, resolving the question of whether refurbishing work is exclusively reserved to BRS employees requires interpretation of these contracts. The Fourth Circuit has held that as long as the dispute "remotely touches on the terms of the relevant collective bargaining agreement," then it is considered minor. "[C]ourts

... deem a dispute as minor if it even remotely touches on the terms of the relevant collective bargaining agreement." Air Line Pilots Ass'n Int'l v. Mesa Airlines, Inc., No. 1:17-CV-236, 2017 WL 2837135, at *4 (E.D. Va. June 29, 2017) (quoting Bhd. of Maint. of Way Employes Div. v. Burlington Northern Santa Fe Ry. Co., 596 F.3d 1217, 1223 (10th Cir. 2010)). The SCL Agreement explicitly covers the "construction, installation, reclaiming, renewal, repair, inspecting, testing, and maintenance, either in the shop or in the field, of all…signals and signaling systems…as well as any other work recognized as signal work" and guarantees that "[n]o employee of other than those classified herein will be required or permitted to perform any of the work covered by the scope of this agreement." The Implementing Agreement further guarantees that "all Signal Shop work currently being performed… at…Savannah, Georgia where such will thereafter be performed on a coordinated CSXT basis under the terms and conditions of the schedule agreement between former SCL and BRS" and that "all such work will thereafter be performed on a coordinated CSXT basis by Carrier employees represented by BRS under the scope of the Schedule Agreement between former SCL and NRS…It is further understood that the work referred to herein will not be sent off the Carriers' properties."

Taken together, the terms of the two agreements bear on all repair and refurbishing work regarding signal equipment, including whether the terms permit CSX to purchase refurbished equipment from third parties. BRS and CSX simply proffer conflicting interpretations of the contracts. BRS contends that CSX attempts to unilaterally alter the terms of the contracts by interpreting the language to create a new right, that of purchasing refurbished equipment from outside vendors. However, a dispute can be minor even if it

involves rights that have not been exercised before or rights not expressly granted by the contract. The Fourth Circuit found a dispute minor when parties disagreed as to whether a preexisting collective bargaining agreement incorporated the new terms and rights established in a new contract. United Transp. Union v. S.C. Pub. Ry. Comm'n, 130 F.3d 627, 633 (4th Cir. 1997). Ultimately, the issue hinged on interpreting and enforcing the terms of the preexisting contract in deciding whether it incorporated all future contracts. Id. Similarly, CSX does not seek to create new rights here but rather argues that the contract has always permitted the purchase of refurbished equipment from third parties.

Second, the dispute at hand involves characterization of work, which has been consistently held a "minor dispute" under the terms of collective bargaining agreements. See e.g., Transp.-Commc'n Employees Union v. Union Pac. R.R., 385 U.S. 157, 164 (1966) ("The Adjustment Board has jurisdiction, which petitioner admits, to hear and decide the controversy over the interpretation of the telegraphers' contract with the railroad as it relates to the work assignments."); Slocum v. Del., Lackawanna & W. R.R. Co., 339 U.S. 239, 244 (1950). BRS claims that purchasing refurbished equipment from third parties necessarily entails contracting for refurbishing labor from third parties, which is work reserved for BRS employees. CSX claims that the contracts reserve the work of refurbishing CSX equipment at CSX facilities to BRS employees, but that it is free to purchase refurbished final products from third parties. However, the Fourth Circuit has held that a dispute about whether work was appropriately characterized as "customer service," and thereby governed by the collective bargaining agreement, was a "minor dispute."   CSX Transp., Inc. v. Transportation Commc'ns Int'l

Union, 480 F.3d 678, 683 (4th Cir. 2007) (denying CSX's request to overturn the arbitration awards granted to the union on jurisdictional grounds).

Here, BRS and CSX dispute whether purchasing refurbished equipment from non-BRS employees can be characterized as the contracting for refurbishing labor. The collective bargaining agreements prohibit CSX from sending off its own properties the kind of "work currently performed…at…Savannah, Georgia." BRS claims CSX violates this in two ways: (1) by sending damaged equipment to a third party to be refurbished; and (2) by purchasing from a third party refurbished equipment. In other words, BRS claims refurbishing labor at any point in the supply chain is the exclusive province of BRS employees. On the other hand, CSX claims the "work" covered by the contract is limited to refurbishment of CSX equipment for use by CSX, which does not include third parties refurbishing CSX equipment for non-CSX use or third parties refurbishing non-CSX equipment for use by CSX. A disagreement about the proper characterization of work under the contracts is a "minor dispute."

### C.     IMPLIED TERMS – PRACTICE, USAGE, and CUSTOM

Without concluding the existence of implied terms under the contract, the court finds CSX's actions "arguably justified" pursuant to the belief that longstanding practice, industry custom, and arbitral authority afford CSX the right to purchase refurbished equipment. In other words, the court finds CSX's belief that the collective bargaining agreements implicitly granted it that right was reasonable. As CSX points out, railway labor agreements never expire and so their terms must constantly evolve. Accordingly, "collective-bargaining agreements may include implied, as well as express, terms," and "'practice, usage and custom'" of the parties is instructive on deciphering the implied terms, just as it is on interpreting express

terms. Consolidated Rail, 491 U.S. at 312. (quoting Transp. Union, 385 U.S. at 161). An agreement cannot be implied based on prior isolated "occurrences of similar conduct," but requires conduct "understood by the parties to at least impliedly serve as if part of the collective bargaining agreement." United Transp. Union, Local Lodge No. 31 v. St. Paul Union Depot Co., 434 F.2d 220, 222 (8th Cir. 1970) (citing United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574 (1960)); accord Air Line Pilots Ass'n Int'l v. E. Air Lines, Inc., 863 F.2d 891, 897 (D.C. Cir. 1988).

In determining the existence of implied contract terms, "courts seem more inclined to look past the black letter provisions to the parties' assumptions about permissible actions." Bhd. of Maint. of Way Employes Div./IBT v. Nat'l R.R. Passenger Corp., 217 F. Supp. 3d 249, 257–58 (D.D.C. 2016). Therefore, courts need not rely on ordinary tools of contract interpretation in evaluating the terms of a collective bargaining agreement; industry norms and the past behavior of the contracting parties are relevant to contract interpretation. See Consolidated Rail, 491 U.S. at 311–12 (1989); Kan. City S. Ry. Co. v. Bhd. of Locomotive Eng'rs & Trainmen, No. 13–838, 2013 WL 3874513, at *4 (W.D. La. July 25, 2013). In determining whether CSX had an implied right to purchase refurbished equipment, the court looks to "the common law of a particular industry or of a particular plant," and the "whole employment relationship" between CSX and BRS. Consolidated Rail, 491 U.S. at 312.

First, CSX points to past practice to demonstrate that its actions are "arguably justified" under the collective bargaining agreements. A district court in the Fourth Circuit held that the claim to an implied right was "arguably justified" when the Carrier could demonstrate a past practice in which the members of a union participated and the union failed to object. Air Line

16

Pilots Ass'n Int'l v. Mesa Airlines, Inc., No. 1:17-CV-236, 2017 WL 2837135, at *7 (E.D. Va. June 29, 2017). Similarly, CSX provides evidence of past practice. CSX claims it had employed outside vendors to repair equipment that could not be repaired at the Savannah Signal Shop, with the knowledge of the BRS employees for up to twenty (20) years. Purl Declaration, ECF No. 21-2, at 2-3. Additionally, CSX claims it has a history of purchasing refurbished equipment from outside vendors, namely RDG, LLC, in 2017, 2018, and 2019. Knopsnider Declaration, ECF No. 21-3, at 1-2.

Conversely, BRS claims that even if there was a past practice of using vendors to refurbish signal equipment and to purchase refurbished products from third party vendors, that BRS was not aware of the practice and therefore did not acquiesce. Demott Second Declaration, ECF No. 29-1, at 2. In Mesa Airlines, the court found the union had acquiesced to the implied right because the union members had "direct involvement" with the bonus programs they challenged. No. 1:17-CV-236, 2017 WL 2837135, at *7; United Transp. Union Local Lodge No. 31 v. St. Paul Union Depot Co., 434 F.2d 222, 223 (8th Cir. 1970) (a party claiming -- "[a]n 'established practice' under the Act should demonstrate not only a pattern of conduct but also some kind of mutual understanding, either express or implied. Thus, prior behavior by itself, although similar to the acts in dispute, falls short of an 'established practice'"); Bhd. of Locomotive Engineers v. Springfield Terminal Ry. Co., 210 F.3d 18, 33 (1st Cir. 2000) ("If a carrier presents evidence that the challenged labor practice has been knowingly acquiesced in by the union, the challenged practice is treated as an implicit term of the collective bargaining agreement and any dispute over the meaning of that term is minor.").

BRS claims its members had no knowledge of CSX hiring third party vendors for refurbishment work or purchasing refurbished products. However, CSX claims that its officer notified Demott as early as August 2019 that the company was considering purchasing outside refurbished equipment, citing the collective bargaining agreements and arbitral decisions for its authority to do so. CSX claims Demott did not dispute this right. Skipper Declaration, ECF No. 21-1, at 3. BRS argues that because the court cannot address "their main contention—that [CSX] violated the CBA and thus the RLA—without first addressing these issues, the case qualifies as a 'major dispute.' " Bhd. of Maint. of Way Employes Div. v. Burlington N. Santa Fe Ry. Co., 596 F.3d 1217, 1226 (10th Cir. 2010). However, the court need not conclude the existence of an implied right, merely find CSX's belief in the existence of one "arguably justified." The court follows the Tenth Circuit in finding that the existence of a threshold factual dispute does not create a "major dispute." "The rail workers' arguments fail because they cannot rebut the undisputed fact that the only source of their right to work is the CBA." Id; see also  Norris, 512 U.S. at 265.

BRS alternatively argues that the magnitude of this decision is so substantially different from any alleged past practice that any claim of acquiescence is irrelevant in establishing an implied term. In Brotherhood of Locomotive Engineers v. Springfield Terminal Ry. Co., the First Circuit chose not to find an implied term when the cited instances of past practices were not sufficiently similar to the contested railway action. The court held that while a union might have acquiesced to a non-union-represented party engaging in the same activity that union members did in the past, those instances were wholly dissimilar to the railway's decision to shift all work historically done by union members to the same third party. Springfield

Terminal, 210 F.3d at 33. "[E]ven the loss of completely new business, never performed by the unions, may be considered a change in the working conditions if the unions traditionally performed work of this type." Id. See also Local 553, Transp. Workers Union v. Eastern Air Lines, 544 F.Supp. 1315, 1327 (E.D.N.Y.1982), modified, 695 F.2d 668 (2d Cir. 1983) ("the deprivation of a work opportunity involving the type of work traditionally performed by the Union is a change in working conditions, even where the work is new."); Air Line Pilots Ass'n Int'l v. Transamerica, 817 F.2d 510, 516 (9th Cir. 1987) (holding the mere "prospect of having work shifted to a replacement subsidiary would constitute a change in the working conditions and practices" sufficient to trigger a major dispute); Burlington N. R. Co. v. United Transp. Union, 862 F.2d 1266, 1276 (7th Cir. 1988) (holding the wholesale deprivation of future work can manifest a major dispute).

The Springfield Terminal decision is inapposite, because unlike the case at hand, the First Circuit found defendants' claim that the plaintiffs acquiesced to the shift of work to a non-union party "totally implausible." Springfield Terminal, 210 F.3d at 33. "If a carrier presents evidence that the challenged labor practice has been knowingly acquiesced in by the union, the challenged practice is treated as an implicit term of the collective bargaining agreement and any dispute over the meaning of that term is minor. To take advantage of the 'minor dispute' provision, the carrier need only show that the implicit contractual term defense is not 'totally implausible.'" Id. (citing Maine Central R.R. Co. v. United Transp. Union, 787 F.2d 780, 782-83 (1st Cir.1986). The court finds CSX's claim that BRS was aware the company was purchasing refurbished equipment from third parties plausible. Bhd. of Maint. of Way Employes Div./IBT v. Nat'l R.R. Passenger Corp., 217 F. Supp. 3d 249, 258 (D.D.C. 2016)

("Although they quarrel with the extent of their knowledge, the Unions had knowledge of the promulgation and enforcement").

Second, CSX points to industry custom and arbitral authority to support its interpretation of the collective bargaining agreements. CSX argues that the railroad industry is a "reserved rights" industry, meaning that "what the agreements do not forbid…the railroad is allowed to do as a matter of contract." Chicago & N.W. Transp. Co. v. Ry. Labor Execs. Ass'n, 908 F.2d 144, 153 (7th Cir. 1990). BRS does not contend that the contracts include express language proscribing the purchase of refurbished equipment, merely that the prohibition on contracting refurbishment labor from third parties implies a prohibition on purchasing refurbished equipment. Industry norms do not favor this reading.

The court finds instructive relevant arbitration decisions. "Despite the lack of explicit language in the Agreement, other arbitration decisions could be used as persuasive precedent, in the same manner that Fourth Circuit opinions are binding precedent in this court but opinions from the Sixth Circuit are merely persuasive and not binding upon this court." Clinchfield Coal Co. v. Dist. 28, United Mine Workers of Am., 45 F. Supp. 2d 513, 515 (W.D. Va. 1998). "In fact, this court has previously recognized that an arbitrator's decisions are followed as precedent by other arbitrators." Id. (citing Clinchfield Coal Co. v. Dist. 28, United Mine Workers of America, 556 F. Supp. 522, 524 (W.D. Va.), aff'd 720 F.2d 1365 (4th Cir. 1983)).The court finds persuasive the arbitration decision CSX first cited as authority to abolish the refurbishment division of the Savannah Signal Shop and then cited in its motion for summary judgment with this court. Exhibit D to Skipper Decl., ECF No. 21-1, at 47.

In a nearly identical case, plaintiff in the instant action BRS claimed Norfolk Southern Railroad ("NSR") violated its collective bargaining agreements when it closed the Roanoke Signal Shop and began purchasing refurbished equipment from third parties. Id. at 48-49. Neutral Arbiter Robert Peterson denied BRS's claim:

> Clearly, the NSR has the right, duty and obligation to its employees, its stockholders, and the public in general, to efficiently and economically manage its facilities and operations. That NSR would contract to sell defective signal equipment as scrap or otherwise to one vendor, and procure new or remanufactured replacements from a separate vendor, is not viewed as having negated any existing collectively bargained right for BRS-represented [employees] to perform repair work on signal equipment that NSR continues to own and decides to have repaired instead of replaced.

Id. at 68. In the decision, Neutral Peterson finds the terms of the agreement do not bear on refurbishing work done "off of the Carrier property on equipment that was not owned, at that point in time by the Carrier" nor whether the carrier "will always handle their scrap in a certain way." Id. at 65. He confirms "[t]he purchase of equipment is a function of management," and identifies the carrier's decision to "purchase the engineering skill of the seller of the railroad equipment" an "exercise of its managerial judgment." Id. at 66. Before the arbiter were several factual disputes, including the question of the railway's past practice of purchasing refurbished equipment and soliciting third party repair work for signal equipment, an issue central to BRS's claim that this case constitutes a "major dispute."

The court finds the arbitration decision is directly on point to the issues at hand and finds no reason to unsettle the findings it makes. Although the decision is not binding on this court in any way, the court finds it relevant evidence that supports its finding that CSX's actions were "arguably justified" under the collective bargaining agreements in place with BRS.

**IV.**

For the reasons stated heretofore, the court finds that it does not have jurisdiction to address the substantive issues in this case because the claims constitute a "minor dispute" subject to obligatory and binding arbitration under the RLA.

An appropriate Order will be entered.

Entered:     December 8, 2020

Michael F. Urbanski
Chief U.S. District Judge
2020.12.08 13:24:49
-05'00'

Michael F. Urbanski
Chief United States District Judge